## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**BRETT M. MCCLAFFERTY,**
c/o CoreCivic
501 Thompson Road
Conneaut, Ohio 44030

    Plaintiff,

-vs-

**PORTAGE COUNTY BOARD OF COMMISSIONERS,**
449 S. Meridian Street, 7th Floor
Ravenna, Ohio 44266

and

**DAVID W. DOAK,**
Portage County Sheriff
8240 Infirmary Road
Ravenna, Ohio 44266

and

**DALE KELLY,**
Individually and in His Official Capacity
as the Chief Deputy of the Portage County
Sheriff's Office
8240 Infirmary Road
Ravenna, Ohio 44266

and

**DANIEL BURNS,**
Individually and in His Official Capacity
as the former Jail Administrator of the
Portage Co. Jail
8240 Infirmary Road
Ravenna, Ohio 44266

and

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO: 19 CV 2219

JUDGE:



JUDGE PEARSON

MAG. JUDGE LIMBERT

<u>**COMPLAINT**</u>

<u>**JURY TRIAL DEMANDED**</u>

FILED
2019 SEP 25  PM 3:17
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

**BRYAN MORGENSTERN,**
Individually and in His Official Capacity
as a Sergeant of the Portage Co. Jail
8240 Infirmary Road
Ravenna, Ohio 44266

and

**WILLIAM BURNS,**
Individually and in His Official Capacity
as an Officer of the Portage Co. Jail
8240 Infirmary Road
Ravenna, Ohio 44266

and

**CORY GERMANI,**
Individually and in His Official Capacity
as an Officer of the Portage Co. Jail
8240 Infirmary Road
Ravenna, Ohio 44266

and

**MICHAEL BURDA,**
Individually and in His Official Capacity
as the Inmate Services Coordinator of the
Portage Co. Jail
8240 Infirmary Road
Ravenna, Ohio 44266

and

**AMY BEANS,**
Individually and in Her Official Capacity
as a Staff Member of the Portage Co. Jail
8240 Infirmary Road
Ravenna, Ohio 44266

and

**COLEMAN PROFESSIONAL
SERVICES,**
3920 Lovers Lane
Ravenna, Ohio 44266

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

2

and                                          )
                                             )
**DR. BRIAN WELSH,**                         )
Individually and in His Official Capacity    )
as the Director of Coleman Prof. Services    )
3920 Lovers Lane                             )
Ravenna, Ohio 44266                          )
                                             )
and                                          )
                                             )
**CCS, LLC dba CORRECT CARE**                )
**SOLUTIONS,**                               )
1283 Murfreesboro Road, Suite 500            )
Nashville, Tennessee 37217                   )
                                             )
and                                          )
                                             )
**UNKNOWN DEFENDANTS,**                       )
In Their Individual and Official Capacities  )
c/o Portage Co. Sheriff's Office             )
8240 Infirmary Road                          )
Ravenna, Ohio 44266                          )
                                             )
and                                          )
                                             )
**UNKNOWN NURSING**                          )
**DEFENDANTS,**                              )
In Their Individual and Official Capacities  )
c/o CCS, LLC                                 )
1283 Murfreesboro Road, Suite 500            )
Nashville, Tennessee 37217                   )
                                             )
and                                          )
                                             )
**UNKNOWN MENTAL HEALTH**                    )
**SERVICES DEFENDANTS,**                     )
In Their Individual and Official Capacities  )
c/o Coleman Professional Services            )
3920 Lovers Lane                             )
Ravenna, Ohio 44266                          )
                                             )
                 Defendants.                 )
                                             )
                                             )
                                             )

3

1.    Plaintiff Brett M. McClafferty for his complaint against Defendants Portage County Board of Commissioners, David W. Doak, Dale Kelly, Daniel Burns, Bryan Morgenstern, William Burns, Cory Germani, Amy Beans, Michael Burda, Coleman Professional Services, Dr. Brian Welsh, Correct Care Solutions, Unknown Defendants, Unknown Nursing Defendants, and Unknown Mental Health Services Defendants allege as follows:

**INTRODUCTION**

2.    The Portage County Jail (the "PCJ") is operating in a state of crisis, endangering the health and safety of Detainees/Inmates on a daily basis. The PCJ is poorly administered, poorly staffed, poorly trained, and intentionally overcrowded – giving rise to a chaotic and perilous environment inside the jail walls that allows for, and even promotes, a culture of sadism and lawlessness to prevail amongst jail staff.

3.    The Plaintiff in this lawsuit, Brett M. McClafferty (Mr. "McClafferty"), is a lobbyist by trade, formerly registered in the State of Ohio, who is currently serving a three-year prison term for financial misconduct occurring within the State of Ohio. Mr. McClafferty has an extensive background in government and law, having served as a Member of the Ohio Workforce Investment Board (Area 19), as a Special Assistant to the Mayor of Akron, Ohio, and as a City Commissioner in Streetsboro, Ohio. He is thirty-one years of age.

4.    This lawsuit arises out of multiple unprovoked, malicious, and violent attacks perpetrated by jail staff against McClafferty, a former detainee at the PCJ. The attacks occurred as a result of McClafferty's unwillingness to ingest medications wrongfully prescribed by a contracted jail psychiatrist, and administered by the contracted jail nursing staff. Medical personnel at the PCJ committed medical malpractice in violation of federal law, by mishandling emergency medical treatment, withholding medications prescribed by McClafferty's primary

4

care physician, and ultimately making substitutions to the withheld medications contrary to the wishes of the primary care physician, and in violation of two court orders.

5.     Although McClafferty was seriously injured from one of these unprovoked and unwarranted attacks, jail staff ignored his pleas for treatment and engaged in torture for approximately seven hours before transporting him to a local hospital. Jail staff continued to deny him appropriate medical treatment upon his return to the PCJ despite the orders of hospital doctors. Rather than abide by their obligations to safeguard McClafferty, jail staff responded to his grievances by engaging in pervasive harassment, continued assaults, and denying him access to his court ordered medications while literally forcing him to take substitute medications meant to treat ailments he had never been diagnosed with.

6.     Senior officials of the Portage County Sheriff's Office and Portage County attempted to conceal the actions of jail staff for nepotistic purposes, and in furtherance of an official policy of the Portage County Sheriff's Office and Portage County to cover up incidents of serious misconduct, medical malpractice, and clear abuses with the PCJ. Defendants' attempts to cover up their actions by intimidation, obstructing official investigations, failing to preserve electronic data, altering documents, destroying documents, and impeding McClafferty's access to public records constituted a pattern of racketeering activity in violation of federal law.

7.     This lawsuit seeks damages for: (1) the use of excessive force in violation of the Fourteenth Amendment to the United States Constitution; (2) the denial of adequate medical care in violation of the Fourteenth Amendment to the United States Constitution; (3) deliberate indifference by jail staff to McClafferty's medical needs in violation of the Eighth Amendment to the United States Constitution; (4) the denial of McClafferty's right to refuse medications in violation of the First, Fourth, Ninth, and Fourteenth Amendments to the United States

Constitution; (5) the implementation of cruel and unusual punishments in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; (6) practicing torture in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution; (7) depriving McClafferty of access to his attorneys in violation of the Sixth Amendment to the United States Constitution; (8) performing warrantless searches of McClafferty's outgoing mail in violation of the Fourth Amendment to the United States Constitution; (9) the cover up of the use of excessive force pursuant to an official policy of the Portage County Sheriff's Office and Portage County in violation of the Fourteenth Amendment to the United States Constitution; (10) conspiring to, and conducting the affairs of a legitimate enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d); (11) committing medical malpractice in violation of 42 U.S.C. § 1395dd; and (12) committing the state law tort of intentional emotional distress.

## JURISDICTION & VENUE:

8.      The jurisdiction of the Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. § 1983; the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42. U.S.C. § 1395dd; 18 U.S.C. § 1962; and the Constitution of the United States. This Court has jurisdiction over McClafferty's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), as well as 18 U.S.C. § 1367.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b). The parties reside/operated, or, at the time the events took place, resided/operated in this judicial district, and the event giving rise to McClafferty's claims also occurred within this judicial district.

## PARTIES:

10.     Plaintiff Brett M. McClafferty was a detainee at the PCJ at all relevant times herein. McClafferty was continuously incarcerated between the dates of September 25th, 2017 and April 18th, 2018 and from on or about May 22nd, 2019 through on or about May 29th, 2019. He is currently incarcerated at the Lake Erie Correctional Institution in Ashtabula County, Ohio.

11.     Defendant Portage County Board of Commissioners is a public entity under the laws of the State of Ohio, entrusted with the legislative and executive authority for county government in Portage County, Ohio, including but not limited to oversight of all county departments and offices, as well as all personnel employed therein.

12.     Defendant David W. Doak was, at all times relevant herein, the Sheriff of Portage County. As the duly elected Sheriff of Portage County, Doak operates in his official capacity as the Portage County Sheriff's Office (the "Sheriff's Office"). He is also the Warden of the PCJ, where he was given custody and charge of McClafferty and was responsible for McClafferty's protection, as well as for the hiring, training, and supervision of all personnel necessary to operate and maintain the PCJ. He is sued in his official capacity.

13.     Defendant Dale Kelly was, at all times relevant herein, either the Chief or Major of the Sheriff's Office, responsible for the administration of the Sheriff's Office and its divisions, including but not limited to the PCJ, with responsibility over the personnel employed therein, and over the detainees/inmates in custody therein. He is sued in both his individual and official capacities.

14.     Defendant Daniel Burns was, at all times relevant herein, the Jail Administrator of the PCJ, responsible for the day-to-day operations of the PCJ, with responsibility over all

personnel employed therein, and over the detainees/inmates in custody therein. He is sued in both his individual and official capacities.

15.     Defendant Bryan Morgenstern was, at all times relevant herein, a Sergeant or Corporal of the PCJ, responsible for the personnel employed on his shift and for the care, custody, and security of McClafferty during his watch. He is sued in both his individual and official capacities.

16.     Defendant William Burns was, at all times relevant herein, a correctional officer of the PCJ, responsible for the immediate supervision and care of McClafferty during his shift. He is sued in both his individual and official capacities.

17.     Defendant Cory Germani was, at all times relevant herein, a correctional officer of the PCJ, responsible for the immediate supervision and care of McClafferty during his shift. He is sued in both his individual and official capacities.

18.     Defendant Michael Burda was, at all times relevant herein, the Inmate Services Coordinator for the PCJ, responsible for the facilitation of detainee/inmate "kites," grievances, and mail. He is sued in his individual and official capacities.

19.     Defendant Amy Beans was, at all times relevant herein, a Staff Member of the PCJ, responsible for responding to Public Record Requests. She is sued in both her individual and official capacities.

20.     Defendant Coleman Professional Services was and is a political subdivision and unit of local government duly organized under the laws of the State of Ohio, who through contract with the Sheriff's Office and/or the PCJ, acts under the color of law in overseeing and providing mental health services and psychiatric care to detainees/inmates within the PCJ. Defendant Coleman Professional Services is a "person" under 42 U.S.C. § 1983 and is

8

responsible for the policies, practices, and customs relating to mental health services and psychiatric care within the PCJ.

21. Defendant Dr. Brian Welsh was, at all times relevant herein, a licensed psychiatrist in the State of Ohio, employed as the Director of Coleman Professional Services, who acted under the color of law in practicing psychiatric medicine within the PCJ. He is sued in both his individual and official capacities.

22. Defendant CCS, LLC dba Correct Care Solutions is a limited liability company organized under the laws of the State of Tennessee, who through contract with the Sheriff's Office and/or the PCJ, acts under the color of law in providing nursing staff and other medical services within the PCJ. Defendant CCS, LLC dba Correct Care Solutions is a "person" under 42 U.S.C. § 1983 and is responsible for the policies, practices, and customs relating to nursing services and medical care within the PCJ.

23. Unknown Defendants were, at all times relevant herein, employees of the Sheriff's Office or its divisions, and were party to the events and allegations described herein. Any and all identifiable individuals, through discovery or otherwise, are sued in their individual and official capacities.

24. Unknown Nursing Defendants were, at all times relevant herein, employees of the CCS, LLC dba Correct Care Solutions, and were party to the events and allegations described herein, and through contract with the Sheriff's Office and/or the PCJ, acted under color of law in performing their duties. Any and all identifiable individuals, through discovery or otherwise, are sued in their individual and official capacities.

25. Unknown Mental Health Services Defendants were, at all times relevant herein, employees of Coleman Professional Services, and were party to the events and allegations

9

described herein, and through contract with the Sheriff's Office and/or the PCJ, acted under color of law in performing their duties. Any and all identifiable individuals, through discovery or otherwise, are sued in their individual and official capacities.

## STATEMENT OF FACTS:

**The Portage County Jail (PCJ):**

26.     The PCJ is a division of the Sheriff's Office. The PCJ is responsible for the security and care of detainees/inmates awaiting criminal court proceedings in Portage County, Ohio.

27.     On information and belief, both the Sheriff's Office and the PCJ maintain legal and beneficial interests in property.

28.     On information and belief, the Sheriff's Office affects interstate commerce and traffics in interstate commerce by running the Portage County Jail and by supervising the purchasing, procurement, salaries, mail systems, communications, distribution, and movement for all detainees/inmates within the jail.

29.     On information and belief, the PCJ affects commerce by purchasing specialized equipment for correctional staff, including but not limited to batons, variations of pepper spray, Tasers, and protective apparel.

**Initial Medical Screening:**

30.     McClafferty was arrested on a secret indictment on September 25th, 2017 and taken into the custody of the Portage County Sheriff's Office. McClafferty was subsequently transported to the PCJ where he was booked into the jail, and remained incarcerated for two hundred and nineteen (219) straight days.

31.     Upon McClafferty's entry at the PCJ, he was screened by jail nursing staff contracted through Defendant Correct Case Solutions. McClafferty informed the nursing staff that he suffered from "severe onset anxiety disorder," and that he was prescribed Alprazolam (Xanax) and Celexa by his primary care physician to treat this condition. McClafferty further informed the jail nursing staff that he also suffered from high blood pressure brought on by anxiety, which is an entirely different medical condition than traditional high blood pressure.

32.     The nursing staff verified McClafferty's prescriptions with his pharmacy and spoke to the primary care physician by phone. Nursing staff successfully verified all of the medical information and history provided by McClafferty.

**Jail Psychiatrist Refuses to Continue Medications:**

33.     After the initial medical screening was completed, an unknown member of the jail nursing staff contacted Defendant Welsh – a psychiatrist and Director of Coleman Professional Services – for whom the PCJ contracts with for mental health services. Defendant Welsh discontinued McClafferty's prescription medications, including the prescription for Alprazolam, because they allegedly violated the PCJ's "narcotic free jail policy;" a policy rooted not in medical science, but rather on outside factors relating to addiction and drug abuse.

34.     On the evening of September 27th, 2017 McClafferty's blood pressure had become dangerously high as a result of untreated severe anxiety as well as withdrawal from his Alprazolam prescription that had been discontinued by Defendant Welsh. McClafferty was never placed on a "benzo withdrawal protocol" as required by state and federal guidelines. Upon information and belief, the PCJ did not have a uniform benzo withdrawal protocol at the time.

35.     McClafferty was being housed in a general population unit of the jail known as DM6, and complained to the correctional officer on duty that he felt "tremendous pressure in his

11

head," and that his anxiety was so severe that he was having panic attacks that created a "levitating" sensation when he would try to lay down. It took two hours for jail nursing staff to respond to the medical call of the correctional officer.

36.     Upon arriving to DM6, an unknown female nurse who was responding to the medical call became hostile towards McClafferty, and appeared visibly annoyed for having been called to the housing unit by the correctional officer to evaluate McClafferty. The nurse seemed to dismiss McClafferty's complaints until she took his vitals and observed a dangerously high blood pressure reading. McClafferty was then moved from the DM6 housing unit to the Medical Observation Unit of the PCJ.

37.     The following day (September 28th, 2017) an unknown male nurse performed a routine blood pressure test that showed McClafferty's blood pressure had risen to stroke levels. McClafferty was transported to a local hospital, where doctors administered Alprazolam, and McClafferty's blood pressure normalized. McClafferty was subsequently discharged back to the PCJ.

38.     Upon returning to the PCJ, McClafferty was informed by Unknown Nursing Defendants that Defendant Welsh had approved an Alprazolam prescription for one week on what is known as a "ween order."

**Judge Orders Continuation of McClafferty's Prescription Medications:**

39.     McClafferty became concerned that while the ween order may prevent the dangers of benzo withdrawal, it would effectively leave his anxiety disorder untreated upon its discontinuation – an equally dangerous proposition. McClafferty decided to place a phone call to Attorney Ashraf Abbas, who was representing McClafferty in the criminal matter for which McClafferty was being detained in the PCJ.

12

40.     After speaking with McClafferty, Attorney Abbas contacted McClafferty's primary care physician to discuss the medical situation.

41.     Satisfied that the situation was dire, Attorney Abbas filed an *"Emergency Motion for Order to Authorize Use of Prescription Medication and for Other Medical Services in Jail"* on October 5th, 2017.

42.     On October 6th, 2017, Judge Becky Doherty of the Portage County Court of Common Pleas GRANTED the motion, thus ordering that McClafferty be given access to the prescription medications that had been discontinued by Defendant Welsh.

**Defendant Welsh Refuses to Comply with Court Order:**

43.     On October 10th, 2017, McClafferty was summoned to speak with Defendant Welsh in a private room of the PCJ, where he informed McClafferty that he would not be following the court order. According to Defendant Welsh, he did not believe that a judge had the authority to order a physician to administer medical care contrary to the wishes of that physician. Defendant Welsh stated that he had left a message for the Judge, and that if the order was not rescinded that he would be filing a complaint with the American Medical Association ("AMA"). Defendant Welsh also informed McClafferty that he had spoken to his primary care physician, and that he had requested that the physician turn-over care to him exclusively. McClafferty's physician refused Defendant Welsh's request.

**Judge Issues Second Court Order; Defendant Welsh Refuses to Comply:**

44.     Judge Becky Doherty held a conference with Defendant Welsh and McClafferty's primary care physician on October 11th, 2017. At the conclusion of the conference, Judge

Doherty issued a second court order requiring that McClafferty's medical care within the PCJ be coordinated between Defendant Welsh and McClafferty's primary care physician.

45.    After days of not receiving medical treatment following the issuance of this second court order, McClafferty inquired about the status of his medications. Defendant Welsh informed McClafferty that he could not coordinate his medical care with his primary care physician because the physician was not covered by the PCJ's medical malpractice insurance, and that such coordination would expose the jail to tremendous liability. Defendant Welsh told McClafferty that he would not be ordering any medical treatment at that time, and suggested "breathing exercises" to help with McClafferty's severe anxiety.

**Defendant Welsh Substitutes Medications:**

46.    As a result of McClafferty's anxiety disorder going untreated, he began to experience severe panic attacks that included sharp chest pains. Unknown Nursing Defendants became concerned about McClafferty's deteriorating condition, and contacted Defendant Welsh to request that he evaluate McClafferty.

47.    At first, Defendant Welsh refused to perform the evaluation, and instead sent an unknown psychologist (PhD not M.D.) from Defendant Coleman Professional Services to evaluate McClafferty. Upon information and belief, the psychologist submitted an emergency request for Defendant Welsh to perform a medical evaluation.

48.    Several days later when McClafferty was finally evaluated by Defendant Welsh, Defendant Welsh unilaterally decided to substitute McClafferty's prescription medications with a new non-narcotic regimen of antipsychotic medications. McClafferty's primary care physician was never consulted as required by the second court order.

14

49.     This regimen included:

> A.  Seroquel (antipsychotic)
> B.  Remeron (antipsychotic)
> C.  Clonidine (blood pressure)

50.     Seroquel is prescribed to combat the symptoms of schizophrenia, a mental disorder marked by delusions, hallucinations, disrupted thinking, and loss of contact with reality (see PDR Family Guide to Prescription Drugs, 610, 8th ed. 2000).

51.     McClafferty is not a schizophrenic, has never been diagnosed with schizophrenia, and has never exhibited any signs or symptoms that could lead a reasonable physician to conclude that he may be a schizophrenic.

52.     According to AstraZeneca (the manufacturer and patentee of Seroquel) in their disclosures to the Federal Drug Administration ("FDA"), Seroquel also presents a substantial risk of dangerous metabolic side effects that can severely impact a patient's blood sugar.

**McClafferty Refuses the New Medications; is Beaten and Injured:**

53.     McClafferty was unwilling to ingest antipsychotic medications designed to treat conditions that he has never suffered from, simply because Defendant Welsh was choosing to ignore two lawful court orders that require McClafferty to be given access to the prescription medications that properly treat a condition that he does suffer from.

54.     On October 20th, 2017 McClafferty was called for "Pill Call" – where jail nursing staff distributes inmate prescription medications – in the general population housing unit DM5, where McClafferty was being housed.

55.     At this Pill Call, McClafferty refused to receive/ingest the new antipsychotic medications ordered by Defendant Welsh. McClafferty was instructed by an Unknown Nursing Defendant working the Pill Call to sign a "refusal of treatment form." McClafferty declined to

sign this form, as he was not refusing treatment in general; he was simply refusing the wrong treatment. McClafferty was more than willing to receive/ingest the prescriptions ordered by his primary care physician, consistent with two court orders, that treated McClafferty's anxiety. McClafferty believed it would be hazardous to his health to ingest antipsychotic medications that treated conditions that he had never been diagnosed with, and did not suffer from.

56.     At approximately 8:00pm on October 20th, 2017, while McClafferty was peacefully reading a book in his jail cell, Defendant William Burns and Defendant Morgenstern performed a "cell extraction" for "insubordination" pertaining to the refusal of treatment form.

57.     McClafferty complied with the commands of officers, but was slammed against the wall nonetheless, and handcuffed by Defendant William Burns. Defendant William Burns began to violently administer closed-fist punches to McClafferty's body and to the back of McClafferty's head. Defendant Morgenstern observed the beating; clearly approving of the corporal punishment and excessive force being deployed. Both Defendant William Burns and Defendant Morgenstern engaged in a profanity-laced verbal assault on McClafferty as well, which included Defendant Morgenstern stating, "this is my jail you piece of shit – I'm the mayor in this motherfucker" (an intended slight and clear reference to McClafferty's public service and political activity in the City of Streetsboro).

58.     Once McClafferty was fully extracted from his cell, he was literally dragged out of the housing unit and down the hallway by the chain that connected the handcuffs behind his back. Defendant William Burns and Defendant Morgenstern ignored McClafferty's painful pleas to stop hyperextending his rotator cuffs, but Defendant William Burns persisted with the activity nonetheless. At some point during this period of hyperextension, McClafferty dislocated his left shoulder.

16

**Jail Officials Engage in Torture:**

59.     Defendant Morgenstern and Defendant William Burns proceeded to strip McClafferty completely naked, in the presence of an unknown female officer, and placed McClafferty in a disciplinary cell nicknamed the "Ice Box" in an area of the jail known as "Court Hallway." McClafferty was provided no clothing, mattress, or bedding.

60.     Upon information and belief, the Ice Box is a cell kept at approximately 50 degrees Fahrenheit. It is kept purposely frigid to induce a freezing sensation on its inhabitant as a form of punishment.

61.     McClafferty was forced to lie naked on a concrete floor in extreme conditions with a dislocated shoulder for nearly seven hours. He was not provided any food or drinking water. A hypothermic McClafferty made several efforts to receive medical attention, but was continuously rebuffed by Defendants.

62.     On two separate occasions, Defendant Germani and a posse of Unknown Defendants entered the Ice Box and held McClafferty to the floor while Defendant William Burns administered some variation of pepper spray to McClafferty's face, creating a burning sensation that triggered asthmatic reactions. These asthmatic reactions caused McClafferty to choke, and subsequently vomit on the floor.

63.     Because the "fountain" mechanism of the one-piece toilet and sink within the Ice Box did not work, McClafferty was forced to wash/rinse the spray from his face and eyes using only his hands and water from the toilet bowl. Since McClafferty was naked, had no clothing, and had no cloth or toilet paper to dry his face – upon washing/rinsing his face, the spray that was administered to the face ran down McClafferty's body thus creating a severe burning sensation to other parts of his body including his genitals.

17

64.     Unknown Defendants (unknown to McClafferty due to blurred vision from the spray) routinely walked past the Ice Box on "rounds" laughing and making lude and lascivious comments towards and/or about McClafferty.

65.     After seven hours of immense suffering, medical staff finally ordered McClafferty to be transported to a local hospital.

66.     Upon his arrival at the hospital, McClafferty had little sensation in the fingers on his left hand and his arm was turning purple from lack of circulation. The dislocation was obstructing blood-flow. A visibly upset emergency room physician accosted the unknown transporting deputy for McClafferty's poor condition. The deputy told the physician to take the matter up with jail staff, as he was only called to handle the transport.

67.     Defendants operated with deliberate indifference to McClafferty's health and safety, and denied McClafferty the minimal civilized measure of life's necessities.

**McClafferty Agrees to Take Substitute Medications to Prevent Further Abuse; Writes Sheriff Directly:**

68.     After McClafferty's shoulder was relocated by hospital staff, he was discharged back to the PCJ. When he arrived at the PCJ, he agreed to receive/ingest the new prescription medications ordered by Defendant Welsh in an effort to prevent further abuse. McClafferty was under the total control of jail staff, and felt helpless given the circumstances. He was moved from Court Hallway to a maximum security cell in the housing unit CM2.

69.     On October 22nd, 2017 McClafferty made the choice to bypass the grievance process at the PCJ, that had proven useless, and wrote a letter directly to Defendant Doak, detailing the egregious misconduct of jail staff and medical personnel.

18

70.     On October 25th, 2017 McClafferty was summoned to the office of Commander Robert Symsek ("Comdr. Symsek"). Comdr. Symsek informed McClafferty that he had spoken directly to Defendant Doak, and that Doak was ordering an investigation into the matters detailed by McClafferty in his letter. Comdr. Symsek and McClafferty discussed the October 20th, 2017 ordeal, and Comdr. Sysmek reviewed the video footage of the incident on his computer, with McClafferty present. Comdr. Symsek seemed visibly upset by what he had seen on the computer, and assured McClafferty that he would be interviewing the individuals involved, to determine whether or not disciplinary action was warranted. In the interim, Comdr. Symsek stated that he was placing a "keep separate order" on Defendant William Burns and McClafferty, which meant that Defendant William Burns would no longer be assigned to any housing unit for which McClafferty was being held. Symsek offered an apology on behalf of Defendant Doak, and ordered that McClafferty be returned to housing unit DM5 from housing unit CM2.

71.     Shortly after being moved to DM5, McClafferty was approached by Defendant Kelly to discuss the events that occurred on October 20th, 2017. McClafferty told Defendant Kelly that he had already spoken to Comdr. Symsek about the incident. Defendant Kelly informed McClafferty that Comdr. Symsek was no longer overseeing the investigation, and that the investigation would be conducted by Defendant Daniel Burns, who was the Jail Administrator at that time. This struck McClafferty as being problematic considering that Defendant Daniel Burns, on information and belief, is the father of Defendant William Burns.

72.     McClafferty questioned Defendant Kelly about the obvious conflict of interest that existed, and was told by the Kelly that he was "lucky" that an investigation was being conducted at all. Defendant Kelly stated, "if you didn't act like such an asshole Brett, you wouldn't have gotten your ass kicked by my guys."

19

**Retaliation by Correctional Officer Against McClafferty:**

73.    Over the next several months, McClafferty became the subject of consistent and pervasive harassment by Defendant Germani, as a proxy for Defendant William Burns who was ordered to be kept separate from McClafferty. This included cell shakedowns, misconduct tickets, cell lockdowns, property confiscations, and verbal assaults – all unwarranted.

74.    On one occasion Defendant Germani conducted a shakedown of McClafferty's cell, and placed McClafferty on a disciplinary lockdown for having a pair of "medical shoes" that were issued to him by jail nursing staff due to a tibia and fibula break McClafferty sustained in 2016. The shoes were confiscated by Defendant Germani, and McClafferty was told to wear the jail issued sandals that caused him pain due to their lack of ankle support. McClafferty attempted to inform Defendant Germani that the medical shoes were issued by the nursing staff, that he needed the shoes for ankle support, and that he had done nothing wrong. Defendant Germani told McClafferty that if he didn't "shut up" that he would extend his period of lockdown.

75.    On another occasion, Defendant Germani performed a shakedown of McClafferty's cell, and claimed he had found plastic eating utensils in McClafferty's cell – an apparent violation of jail rules. McClafferty was once again placed on a disciplinary lockdown and put on commissary and visitation restrictions. McClafferty tried to explain that the utensils had been provided by jail staff to his former cellmate, a practicing Muslim, to eat special "halal meals" that were required by the Islamic religion. This former cellmate had been discharged from the jail only hours earlier, and McClafferty was unaware that the utensils were still in the cell. Defendant William Burns lashed out at McClafferty, referring to him as a "snitch" for instigating the investigation into the October 20th, 2017 incident, and stated that he would

continue to make McClafferty's life miserable until he left the jail, or died, whichever came first. This was said in the presence of other inmates.

**McClafferty is Assaulted by Defendant William Burns for the Second Time:**

76.    On the evening of March 29th, 2018 McClafferty once again refused the substitute prescription medications ordered by Defendant Welsh. The Seroquel made McClafferty extremely drowsy for long periods of time, and he had a sentencing hearing scheduled for the following morning. McClafferty did not want to be in a drug-induced stupor for this important event.

77.    McClafferty was once again told by nursing staff that he would need to sign a refusal of treatment form, for which he declined. The unknown nurse working that evening's Pill Call, called for the assistance of the correctional officer on duty in the housing unit DM5. Because this correctional officer was a female, she in turn called "Central Command" at the PCJ. The three responding mail officers were Defendant Morgenstern, Defendant William Burns, and Deputy Sheriff Holbrook. Deputy Holbrook was acting in the capacity of a correctional officer for that shit.

78.    Defendant William Burns and Deputy Holbrook performed a cell extraction, where Deputy Holbrook calmly asked McClafferty to place his hands on the wall. McClafferty complied, and Defendant William Burns aggressively placed McClafferty in handcuffs. Defendant William Burns addressed McClafferty angrily stating, "you think you can get me fired, snitch? I've been waiting for this opportunity you fucking piece of shit!" Defendant William Burns began to assault McClafferty from behind, shoving him violently towards the exit of the housing unit. When the officers and McClafferty reached the hallway, McClafferty spotted Defendant Morgenstern and told Morgenstern that he had a "keep separate order" with

21

Defendant William Burns. Defendant Morgenstern replied, "who the fuck do you think you are

to tell me my job?" Defendant William Burns then purposely stepped on one of McClafferty's

jail-issued sandals which made McClafferty stumble. Defendant William Burns began to scream

repeatedly, "stop resisting!" while yanking McClafferty's handcuffed hands higher and higher up

his back, once again hyperextending McClafferty's already injured shoulder. Deputy Holbrook

told Defendant William Burns to "chill out" and stated that McClafferty was not resisting, to

which Defendant William Burns responded with, "fuck off!"

79.     McClafferty was placed in a maximum security cell, and placed on

"administrative lockdown" for thirty days. McClafferty never received a ticket or conduct report,

but was told that he was placed on "admin" due to security concerns. This was clearly intended

to be a punishment, and had nothing to do with jail security.

80.     On March 31st, 2018 McClafferty was once again summoned to the office of

Comdr. Symsek, where McClafferty was informed that he was performing a disciplinary review

of Defendant William Burns, as he believed Defendant William Burns had violated jail policies

and failed to follow proper protocol relating to the March 29th, 2018 incident. Comdr. Symsek

also stated that he would forward all of his disciplinary findings to the Detectives Bureau of the

Portage County Sheriff's Office for review. Comdr. Symsek asked if McClafferty would be

willing to make a formal statement against Defendant William Burns, to which McClafferty

declined out of fear of retaliation.

**McClafferty is Interviewed by a Sheriff's Department Detective:**

81.     McClafferty was interviewed by Detective Springer of the Portage County

Sheriff's Office on or about April 11th, 2018. Detective Springer stated that he was asked to

22

investigate several incidents within the PCJ, and asked several questions relating to this investigation.

82.    Detective Springer made two significant disclosures to McClafferty during this interview:

1.   That Detective Springer was having a "hard time" gathering facts relating to the incidents under investigation because he was being "stonewalled" by Defendant Daniel Burns and jail staff. He stated that correctional officers were threatening union grievances, and that medical personnel were citing patient confidentiality in an effort to withhold records.

2.   That McClafferty should be careful with what he sends in the mail, even to his attorneys, as McClafferty's outgoing mail was being subjected to [warrantless] searches by Defendant Burda, at the direction of Defendant Daniel Burns.

83.    Shortly after this interview, McClafferty filed a grievance against Defendant Burda, and an infuriated Defendant Burda accosted McClafferty in his housing unit about filing the grievance. McClafferty explained to Defendant Burda that he had it on "good authority" that his outgoing mail was being tampered with, and that such an illegal search and seizure was a violation of federal law. Defendant Burda responded, "federal shmederal! I don't give a damn!" This incident was witnessed by detainee/inmate Jordan Grimes, and others.

84.    On information and belief, following McClafferty's interview with Detective Springer, Defendant Daniel Burns resigned as Jail Administrator and retired from law enforcement.

**McClafferty is Transported to ODRC; Diagnosed Prediabetic and Hyperglycemic:**

85.    On April 18th, 2018 McClafferty was transported to the Ohio Department of Rehabilitation & Correction ("ODRC") to begin serving a two-year sentence on Portage County Common Pleas Case No. 2017CR01115 ("17CR1115") while the State of Ohio's interlocutory

23

appeal in Portage County Common Pleas Case No. 2017CR00775 ("17CR775") was pending

before Ohio's Eleventh District Court of Appeals.

86.     Upon his entry into the ODRC at the Lorain Correctional Institution ("LorCI") in

Grafton, Ohio, McClafferty was diagnosed prediabetic and hyperglycemic by prison physicians.

McClafferty also discovered that he had gained twenty pounds during his period of

detention/incarceration within the PCJ.

87.     Dr. Kline, a psychiatrist at LorCi, immediately discontinued Defendant Welsh's

Seroquel order and placed McClafferty back on Celexa. Dr. Kline told McClafferty that it was

"unconscionable" for a mental health professional to have prescribed or administered Seroquel to

a non-schizophrenic. He further explained that Seroquel is a banned medication within the

ODRC due to its substantial risk of serious metabolic side effects.

88.     Dr. Kline went on to inform McClafferty that he used to work with Defendant

Welsh at Coleman Professional Services, and that he regarded Defendant Welsh as being a

"zealot on a crusade against benzos." He categorized Defendant Welsh's psychiatric beliefs as

"radical" and "too extreme for mainstream medicine."

**McClafferty Discovers that Seroquel Caused His Blood Sugar Issues:**

89.     McClafferty was "borrowed" from the ODRC by the Summit County Court of

Common Pleas for a pending legal matter, on May 30th, 2018 until on or about November 20th,

2018. During this period of time, McClafferty was being held in the Summit County Jail (the

"SCJ") and he was being monitored by Summit Psychological Services ("Summit Psych.") for

his anxiety disorder. Summit Psych. is the contracted mental health services provider of the SCJ.

90.     On or about October 5th, 2018 McClafferty was assessed by Dr. Calhoun, a

psychiatrist employed by Summit Psych. During this assessment, Dr. Calhoun reiterated Dr.

24

Kline's position about Seroquel having been prescribed to McClafferty – a non-schizophrenic. Dr. Calhoun, however, went a step further and informed McClafferty that Seroquel causes hyperglycemia. Dr. Calhoun went on to state that he believed that McClafferty's long-term exposure to Seroquel while in the PCJ was the likely cause of McClafferty's hyperglycemia and prediabetic condition.

**McClafferty Returns to the Portage County Jail:**

91.　　McClafferty returned to the PCJ on or about May 22nd, 2019 following the adjudication of the State of Ohio's interlocutory appeal in 17CR775.

92.　　While being held in the PCJ during this second bout of detention, McClafferty submitted a health services "kite" inquiring about his medications. Unknown Nursing Defendants responded to McClafferty's kite stating that they had no record of medications for McClafferty. McClafferty then filed a grievance, requesting to speak to Defendant Welsh.

93.　　When McClafferty met with Defendant Welsh to discuss his medications, McClafferty informed Defendant Welsh of his metabolic issues relating to the Seroquel, and reminded Defendant Welsh that the court orders issued in 17CR775 pertaining to his prescription medications were still in place and in full effect. Defendant Welsh became angry, and seethed that he had "never and will never honor those court orders." Defendant Welsh further asserted that since McClafferty would likely only be in the PCJ a relatively short period of time, that he "could make it" without any medications.

94.　　McClafferty's untreated anxiety flared up, inducing severe panic attacks and spiking his blood pressure to dangerously high levels. McClafferty would remain untreated for the duration of this second period of detention.

95.     After seven days in the PCJ, a global resolution was reached with prosecutors which required the dismissal of several charges. McClafferty was transported back to the ODRC on or about May 29th, 2019. With all Portage County cases closed, the physician-patient relationship was officially terminated on this date.

**Defendants Make a Concerted Effort to Cover Up the Incidents of Abuse and Misconduct; Block a Truthful Investigative Report About the Incidents:**

96.     Defendants attempted to cover up or deny the incidents as soon as they happened. Defendant Morgenstern and Defendant William Burns, in concert with others, altered or made incorrect entries in log books and records to give the appearance that they had not participated in the alleged abuse and misconduct. Also, despite PCJ's requirement that correctional officers write reports when they use force against detainees, none of the officers, including Defendant Morgenstern, Defendant William Burns, Deputy Holbrook, and Defendant Germani, wrote reports relating to the incidents detailed herein. Further, Defendant Morgenstern, Defendant William Burns, and Defendant Germani denied McClafferty necessary medical care in a timely manner in an effort to hide their misconduct.

97.     Defendants operated in concert to try and conceal the abuses by Defendants from internal and external investigators and to attempt to keep the internal investigation from reaching a solution.

98.     Upon information and belief, Defendants were made aware that there would be legal consequences of the October 20th, 2018 abuse shortly after it happened. Defendant Doak ordered an investigation into the incident within days of it occurring. The investigation was originally assigned to Comdr. Symsek. Shortly thereafter, the investigation was reassigned by Defendant Kelly to Defendant Daniel Burns. The investigation remained dormant until

Defendant Daniel Burns' resignation, and the investigation was ultimately conducted by Detective Springer.

99. Although Detective Springer attempted to conduct an honest investigation, he was hampered by institutional resistance. Nevertheless, Detective Springer interviewed McClafferty and many other individuals believed to have knowledge of the incidents. Upon information and belief, Detective Springer discovered that Defendants failed to preserve electronic data, altered documents, and destroyed documents. Further, it was discovered that Defendant Beans impeded McClafferty's access to public records at the direction of jail administration.

100. Detective Springer completed his preliminary report in April of 2018. Upon information and belief, Defendant Daniel Burns contacted Defendant Kelly to question the basis of the report and Detective Springer's authority to conduct such an investigation. Though the report was promptly forward to Defendant Doak's office with a notation that further inquiries should be made, the investigation was halted and never completed.

**The Cover-Up is an Official Policy of the Sheriff's Office and the Portage County Board of Commissioners:**

101. The acts described above are part of an institutional practice or custom, constituting an official policy of the Sheriff's Office of covering up for instances of serious misconduct, especially the use of excessive force, by jail staff, and of sanctioning repeated interference by jail staff into detainees' abilities to pursue their legal claims.

102. On information and belief, Defendant Doak and Defendant Portage County Board of Commissioners had prior notice of the propensity of Sheriff's Office and Portage County employees to cover-up excessive force by jail staff but took inadequate steps to train and supervise these employees, correct their abuse of authority, or implement meaningful procedures

27

to discourage their unlawful abuse of power. The failure to properly supervise and/or train the employees included the failure to properly instruct them in applicable provisions of the Ohio Administrative Code, the Ohio Revised Code, and proper investigative procedures.

103. On information and belief, Defendant Doak and Defendant Portage County Board of Commissioners tolerated, as institutional policy, practice, or custom, or authorized and ratified the systematic pattern by their employees of covering up the excessive use of physical force by jail staff, with the intention of and/or having the effect of depriving McClafferty of his rights and privileges afforded to him by the United States Constitution.

104. The effect of this policy was to encourage PCJ employees, including Defendant Morgenstern, Defendant William Burns, and Defendant Germani, to use excessive force against detainees at the PCJ, and to continuously harass detainees after such excessive force is used. In doing so, the policy contributed to the physical assaults on McClafferty and his resulting injury, as well as the deprivation of his constitutional rights.

105. The practice or custom includes the following tactics by the Sheriff's Office, which are used so frequently that they amount to an official policy of the Sheriff's Office:

    a. Responding to McClafferty's and other detainees' complaints of misconduct, including excessive use of force, with inadequate investigations and grievance responses calculated to mislead the public and which show a deliberately indifferent attitude towards official misconduct;

    b. Providing no protection for Sheriff's Office investigators such as Detective Springer to conduct proper investigations of allegations of excessive force, but instead permitted harassment and intimidation of the investigators;

    c. Allowing correctional officers being investigated for serious misconduct to continue working – and even receive promotions – while the investigations are ongoing;

    d. Failing to remove officers from assignments in which they come in contact with detainees while they are being investigated for serious misconduct,

28

including but not limited to excessive force;

e.  Delaying investigations for months and even years, during which time the guards being investigated may receive promotions and may continue to work in situations where they are exposed to detainees, while the statute of limitations on criminal charges against the officers continues to run or expires;

f.  Providing no protection or incentives for employees who are witnesses to excessive force to cooperate with investigations by telling the truth about what they saw, or to report instances of excessive force they learn about, and instead providing incentives for covering up excessive force;

g.  Failing to support investigators who conduct competent and thorough investigations, and instead undermining their authority by refusing to sustain recommendations;

106.  The practice or custom includes the following tactics by the Portage County Sheriff's Office by and through Defendant Doak and Defendant Portage County Board of Commissioners, which are used so frequently that they amount to an official policy of Defendant Doak and Defendant Portage County Board of Commissioners:

a.  Providing not protection or incentives for medical personnel at the PCJ to treat inmates' injuries from excessive force promptly and adequately and to document the injuries appropriately, and instead providing protection from medical personnel to refuse treatment and falsify or omit documentation of medical care;

b.  Providing no protection or incentives for medical personnel who have relevant information about excessive force to cooperate with investigations by telling the truth about what they saw or to report instances of excessive force they learn about, and instead providing incentives for covering up excessive force;

c.  Failing and refusing to institute procedures and setup guidelines that would require medical personnel to cooperate with the Sheriff's Office's investigations of excessive force by PCJ staff; and

d.  Failing to implement and utilize a valid investigative procedure by the Commissioners, instead of by the Sheriff's Office, for investigating possible misconduct by medical personnel at the PCJ in dealing with injuries that may be caused by the use of excessive force by jail guards.

**McClafferty Continues to Suffer from Injuries Sustained in the PCJ:**

107.    McClafferty has sustained permanent physical and psychological trauma, has suffered great pain and discomfort, and continues to experience physical and psychological damage. McClafferty has been referred for orthopedic surgery by prison physicians to repair significant ligament damage to his left shoulder upon his release from prison, which will lead to a reduced quality of life and lost income.

**COUNT I**
**Section 1983 Claim Against Defendants Morgenstern, William Burns,**
**Germani, and Unknown Defendants for Use of Excessive Force**

108.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

109.    As Described above, Defendants Morgenstern, William Burns, Germani, and Unknown Defendants used excessive force against McClafferty on or about October 20th, 2017 and/or March 29th, 2017, without provocation and without legitimate penal justification, and Unknown Defendants failed to stop the unprovoked and unjustified excessive use of force against McClafferty.

110.    The actions of Defendants Morgenstern, William Burns, Germani, and Unknown Defendants were performed under color of state law, and violated McClafferty's rights under the Fourteenth Amendment to the United States Constitution.

111.    The acts of excessive force by Defendants Morgenstern, William Burns, Germani, and Unknown Defendants against McClafferty were the direct and proximate cause of serious and ongoing physical and psychological injuries to McClafferty.

112.    The conduct of Defendants Morgenstern, William Burns, Germani, and Unknown Defendants was willful and exhibited a flagrant disregard for McClafferty's federally secured

30

due process rights. Accordingly, these defendants are liable to McClafferty under 42 U.S.C. § 1983.

## COUNT II
### Section 1983 Claim Against Defendants Morgenstern, William Burns, Germani, and Unknown Defendants for Use of Torture

113.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

114.    As Described above, Defendants Morgenstern, William Burns, Germani, and Unknown Defendants used torture against McClafferty on or about October 20th, 2017, and Unknown Defendants failed to stop the use of torture against McClafferty.

115.    The actions of Defendants Morgenstern, William Burns, Germani, and Unknown Defendants were performed under color of state law, and violated McClafferty's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

116.    The acts of torture by Defendants Morgenstern, William Burns, Germani, and Unknown Defendants against McClafferty were the direct and proximate cause of serious and ongoing physical and psychological injuries to McClafferty.

117.    The conduct of Defendants Morgenstern, William Burns, Germani, and Unknown Defendants was willful and exhibited a flagrant disregard for McClafferty's federally secured rights. Accordingly, these defendants are liable to McClafferty under 42 U.S.C. § 1983.

## COUNT III
### Section 1983 Claim Against Defendants Morgenstern, William Burns, Germani, and Unknown Defendants for Deliberate Indifference to Medical Needs

118.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

119.    As Described above, Defendants Morgenstern, William Burns, Germani, and Unknown Defendants failed to ensure that McClafferty received prompt and adequate medical

31

care subsequent to the excessive force and torture used against him on or about October 20th,
2017.

120.     The actions of Defendants Morgenstern, William Burns, Germani, and Unknown
Defendants exhibited deliberate indifference to McClafferty's serious medical needs, were
performed under color of law, and violated McClafferty's rights under the Fourteenth
Amendment to the United States Constitution.

121.     As a direct and proximate result of the actions of Defendants Morgenstern,
William Burns, Germani, and Unknown Defendants in failing to ensure that McClafferty
received prompt and adequate medical care, McClafferty was subjected to increased pain,
suffering, and serious physical injury.

122.     The conduct of Defendants Morgenstern, William Burns, Germani, and Unknown
Defendants was willful and exhibited a flagrant disregard for McClafferty's federally secured
rights. Accordingly, these defendants are liable to McClafferty under 42 U.S.C. § 1983.

## COUNT IV
### Section 1983 Claim Against Defendants Doak, Kelly, Daniel Burns, Morgenstern, and Unknown Defendants for Denial of Access to Attorney

123.     The allegations of paragraphs 1 through 106 are incorporated herein by reference.

124.     As Described above, Defendants Doak, Kelly, Daniel Burns, Morgenstern, and
Unknown Defendants denied McClafferty access to his attorney while he was in the custody of
the PCJ, being held in Court Hallway, and while McClafferty was on administrative lockdown in
the maximum security wing of the PCJ, and exhibited a completely indifferent attitude towards
McClafferty's right to confer with legal counsel.

125.     The actions of Defendants Doak, Kelly, Daniel Burns, Morgenstern, and
Unknown Defendants were performed under color of state law, and violated McClafferty's due

process rights under the Fourteenth Amendment to the United States Constitution, as well as his rights under the Sixth Amendment to the United States Constitution.

126.    As a direct and proximate result of the actions of Defendants Doak, Kelly, Daniel Burns, Morgenstern, and Unknown Defendants, McClafferty was unable to consult with legal counsel prior to trial, prior to sentencing, and subsequent to the excessive use of force and use of torture against McClafferty by Defendants Morgenstern, William Burns, Germani, and Unknown Defendants, and has suffered damages as a result.

127.    The conduct of Defendants Doak, Kelly, Daniel Burns, Morgenstern, and Unknown Defendants was willful and exhibited a flagrant disregard for McClafferty's federally secured rights. Accordingly, the defendants are liable to McClafferty under 42 U.S.C. § 1983.

### COUNT V
**Section 1983 Claim Against Defendants Doak, Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, Unknown Defendants, Coleman Professional Services, Welsh, Unknown Mental Health Services Defendants, Correct Care Solutions, and Unknown Nursing Defendants for Cover Up by Sheriff's Office Employees and Contractors**

128.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

129.    As Described above, the actions of Defendants Doak, Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, Unknown Defendants, Coleman Professional Services, Welsh, Unknown Mental Health Services Defendants, Correct Care Solutions, and Unknown Nursing Defendants in covering up the use of excessive force and torture by Defendants Morgenstern, William Burns, Germani, and Unknown Defendants pursuant to an official policy of the Sheriff's Office and the Portage County Board of Commissioners were performed under color of law, and violated McClafferty's rights guaranteed under the Fourteenth Amendment to the United States Constitution.

130.    The actions of Defendants Doak, Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, Unknown Defendants, Coleman Professional Services, Welsh, Unknown Mental Health Services Defendants, Correct Care Solutions, and Unknown Nursing Defendants in covering up of acts of excessive force and torture against McClafferty were the direct and proximate cause of serious and ongoing physical and psychological injuries to McClafferty.

131.    The conduct of Defendants Doak, Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, Unknown Defendants, Coleman Professional Services, Welsh, Unknown Mental Health Services Defendants, Correct Care Solutions, and Unknown Nursing Defendants was willful and exhibited a flagrant disregard for McClafferty's federally secured due process rights. Accordingly, these defendants are liable to McClafferty under 42 U.S.C. § 1983.

**COUNT VI**
**Section 1983 Claim Against Defendant Portage County Board of Commissioners**
**for Cover Up by Portage County Employees**

132.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

133.    As Described above, the actions of Defendant Portage County Board of Commissioners in the cover up by Portage County employees for the use of excessive force and torture against McClafferty pursuant to an official policy of the Sheriff's Office and of the Portage County Board of Commissioners were performed under color of law, and violated McClafferty's federally secured due process rights under the Fourteenth Amendment to the United States Constitution.

134.    The actions of Defendant Portage County Board of Commissioners and/or Portage County employees in covering up of acts of excessive force and torture against McClafferty were

the direct and proximate cause of serious and ongoing physical and psychological injuries to McClafferty.

135.    The conduct of Defendant Portage County Board of Commissioners and/or Portage County employees was willful and exhibited a flagrant disregard for McClafferty's federally secured due process rights. Accordingly, this defendant is liable to McClafferty under 42 U.S.C. § 1983.

## **COUNT VII**
**Racketeer Influenced and Corrupt Organizations Act (RICO) § 1962(c) Claim Against Defendants Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, and Unknown Defendants**

136.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

137.    This Count is against Defendants Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, and Unknown Defendants (the "RICO Defendants").

138.    The Sheriff's Office and the PCJ are enterprises engaged in and whose activities affect interstate commerce. The RICO Defendants are employed by the Sheriff's Office.

139.    The RICO Defendants agreed to and did participate in the conduct of the Sheriff's Office and/or the PCJ's affairs through a pattern of racketeering activity. Specifically, the RICO Defendants corruptly endeavored to influence, obstruct, or impede the due administration of justice, in violation of 18 U.S.C. § 1503, by engaging in the conduct described above. In addition, the RICO Defendants corruptly attempted to persuade others to withhold a record, document, or other object from an official proceeding or public record request, and otherwise attempted to obstruct, influence, or impede an official investigation, in violation of 18 U.S.C. § 1512, by engaging in the conduct described herein.

35

140.    Pursuant to, and in furtherance of their racketeering activities, the RICO Defendants committed multiple related acts of obstruction of justice and obstruction of an official investigation.

141.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

142.    The RICO Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

143.    As a direct and proximate result of the RICO Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), McClafferty has suffered irreparable harm and injury.

## COUNT VII
### Racketeer Influenced and Corrupt Organizations Act (RICO) § 1962(d) Claim Against Defendants Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, and Unknown Defendants

144.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

145.    As described above, the RICO Defendants agreed to and conspired to violate 18 U.S.C. § 1962(c).

146.    The RICO Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the Sheriff's Office and/or the PCJ's affairs through a patterns of racketeering activity. The RICO Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

36

147.    As a direct and proximate result of the RICO Defendants' conspiracy, the overt

acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(c), McClafferty

has suffered irreparable harm and injury.

## COUNT IX
**Emergency Medical Treatment and Active Labor Act (EMTALA) § 1395dd Claim
Against Defendants Coleman Professional Services, Welsh, Unknown Mental Health
Services Defendants, Correct Care Solutions, and Unknown Nursing Defendants**

148.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

149.    This count is against Defendants Coleman Professional Services, Welsh,

Unknown Mental Health Services Defendants, Correct Care Solutions, and Unknown Nursing

Defendants (the "EMTALA Defendants").

150.    The EMTALA Defendants, through contracts with the Portage County Board of

Commissioners and/or the Sheriff's Office and/or the PCJ, act under color of law and are

responsible for the emergency medical and mental health care needs of detainees/inmates within

the walls of the PCJ.

151.    As described above, the EMTALA Defendants committed medical malpractice

when administering emergency medical and mental health care to McClafferty, and violated

42 U.S.C. § 1395dd.

152.    The EMTALA Defendants were grossly negligent, deliberately indifferent, and

contemptuous in their administration of medical and mental health care, as they ignored two

court orders pertaining to McClafferty's medical and mental health care within the PCJ.

153.    As a direct and proximate result of the EMTALA Defendants' medical

malpractice, gross negligence, deliberate indifference, contempt, and violations of 42 U.S.C. §

1395dd, McClafferty has suffered serious and ongoing physical and psychological injuries.

154.    The conduct and actions of the EMTALA Defendants were willful and exhibited a flagrant disregard for McClafferty's federally secured rights. Accordingly, these defendants are liable to McClafferty under 42 U.S.C. § 1395dd.

## COUNT X
### Intentional Infliction of Emotional Distress Claim Against Defendants Doak, Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Unknown Defendants, Coleman Professional Services, Welsh, Unknown Mental Health Services Defendants, Correct Care Solutions, and Unknown Nursing Defendants

155.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

156.    As described above, the conduct of Defendants Doak, Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Unknown Defendants, Coleman Professional Services, Welsh, Unknown Mental Health Services Defendants, Correct Care Solutions, and Unknown Nursing Defendants throughout the course of McClafferty's detention within the PCJ was extreme and outrageous, including without limitation using malicious and excessive force, as well as torture, against McClafferty without provocation or justification, and subsequently engaging in pervasive harassment, and imposing unwarranted disciplinary measures.

157.    Moreover, despite two court orders requiring that McClafferty receive specific medications previously prescribed by his primary care physician and other medical care, Defendants were deliberately indifferent to his needs and allowed him to suffer untreated or mistreated for approximately 226 days.

158.    Defendants either intended to inflict emotional distress upon McClafferty when engaging in this conduct, or knew that there was a high probability that such conduct would result in such distress.

159.    Defendants' conduct caused McClafferty to suffer severe emotional distress that no reasonable person could be expected to endure.

38

## COUNT XI

**Indemnification Claim Against Defendant Portage County Board of Commissioners**

160.    The allegations of paragraphs 1 through 106 are incorporated herein by reference.

161.    Pursuant to Ohio law, Defendant Portage County Board of Commissioners is empowered and directed to pay any tort judgment for compensatory damages (and any associated attorneys' fees and costs) for which an independently elected Portage County officer, such as Defendant Doak (or his deputies/officers), is acting within the scope of their employment and is found liable.

162.    Defendant Portage County Board of Commissioners is liable for any judgment entered against Defendants Doak, Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, and Unknown Defendants for compensatory damages and for any associated attorneys' fees and costs.

163.    In the event a judgment for compensatory damages is entered against these defendants, Defendant Portage County Board of Commissioners must pay the judgment, as well as any associated attorneys' fees and costs.

39

WHEREFORE McClafferty requests that this Court grant him the following relief, jointly and a severally against the named defendants:

A.  Judgment for compensatory damages against all defendants in the amount of seven hundred thirty-two thousand dollars ($732,000.00), or in an amount to be determined at trial;

B.  Judgment for punitive damages against all defendants in the amount of ten million dollars ($10,000,000.00), or in an amount to be determined at trial;

C.  An award of the costs of this action against all defendants, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988 and/or 18 U.S.C. § 1964(c);

D.  An award of treble damages against the RICO Defendants, in accordance with 18 U.S.C. § 1964(c);

E.  An order requiring Defendant Portage County Board of Commissioners to pay any judgment for compensatory damages entered against Defendants Doak, Kelly, Daniel Burns, Morgenstern, William Burns, Germani, Burda, Beans, and Unknown Defendants, as well as the associated attorneys' fees and costs; and

F.  Such other and further relief the court deems appropriate.

***TRIAL BY JURY ON ALL CLAIMS FOR RELIEF HEREBY DEMANDED***

Respectfully Submitted,

BRETT M. MCCLAFFERTY (750839)
*Plaintiff, Pro Se Litigant*
c/o CoreCivic
501 Thompson Road
Conneaut, Ohio 44030
P. (440) 599.4100

Dated: September 20th, 2019

40